618 So.2d 1023 (1993)
WKG-TV VIDEO ELECTRONIC COLLEGE, INC., Plaintiff-Appellant,
v.
Donald Gene REYNOLDS, Defendant-Appellee.
No. 92 CA 0487.
Court of Appeal of Louisiana, First Circuit.
April 23, 1993.
*1024 Walter Clawson, Shreveport, for plaintiff-appellant WKG-TV Video Electronic College, Inc.
Joseph Lewis, Baton Rouge, for WKG-TV Video Electr. College & Walter Guillot.
Richard Zimmerman, Baton Rouge, for defendant-appellee Donald Gene Reynolds.
Before WATKINS, CRAIN and GONZALES, JJ.
CRAIN, Judge.
WKG-TV Video Electronic College, Inc. (WKG), was the owner and operator of WKG-TV Video Electronic Institute (Institute). WKG was a Louisiana corporation located in Baton Rouge. Its shareholders were Walter K. Guillot (60%) and Lionel J. Thibodeaux (40%). They were also the officers and directors of WKG. The Institute was located in Houston, Texas. WKG and Donald Gene Reynolds entered into an "Agreement to Buy/Sell" by which Reynolds *1025 was to purchase the Institute. The agreement was signed on June 6, 1989, by Reynolds and Walter K. Guillot (Guillot) who signed as president of WKG. The selling price was $100,000; $50,000 of which had previously been given to WKG as a deposit and the balance of $50,000 to be paid upon completion of the sale. Upon completion of the sale which was scheduled for July 1st, Reynolds was supposed to take over operation of the Institute.
The contract provided that WKG was to create a new corporation, DR Education Corporation, Inc. (DR), which was to be incorporated in Texas. Immediately thereafter, WKG was to transfer the Institute to DR; obtain DR's approval as a "free standing" school by the Southern Association of Colleges and Schools; and obtain the approval of the transfer of ownership to DR by the U.S. Department of Education and the Guaranteed Student Loan Corporation which approval was to have been obtained by July 1, 1989.
The accreditation of DR by the Southern Association of Colleges and Schools as a free standing school was obtained on June 30, 1989. Notice of the accreditation was received on July 4. At that time WKG was able to apply to various regulatory agencies for the requisite approval.
Pursuant to the agreement of June 6th, Reynolds, through his two sons, took over operation of the Institute on July 1st even though the Institute had never been transferred to DR. Reynolds kept urging WKG, Guillot and Murvin, a WKG employee, to complete the transfer to DR so that the sale could be perfected. Pursuant to the contract WKG was to pay all expenses of the Institute which were incurred prior to July 1st. Accounts receivables including student fees, grants, and tuition due from student loans were to be prorated as of July 1st and paid to Reynolds by August 1st. WKG's only compliance was the incorporation of DR. The Institute was never transferred to DR. By Labor Day (September, 1989) WKG had still not submitted the requisite forms for approval to the regulatory agencies. Murvin met with Reynolds demanding that Reynolds pay the fees and costs for obtaining the approval from the regulatory agencies. Reynolds refused to give WKG any additional money until WKG performed under the contract.
In mid November, Guillot met with Reynolds and informed him that WKG was voiding the agreement to purchase. Reynolds refused. On December 4, 1989, WKG took over operation of the Institute, fired Reynolds' two sons, and sent students who intended to enroll at the Institute home, telling them to return in January. WKG refused to return Reynolds' $50,000 deposit. On December 5, 1989, WKG instituted an action against Reynolds for breach of contract, a rule to show cause to order Reynolds to allow WKG to resume operations of the Institute, and sought damages for breach of contract.
Reynolds answered the petition and reconvened against WKG, and Guillot and Thibodeaux individually for intentional interference with a contract. Reynolds initially sought specific performance and damages.
Reynolds subsequently learned that WKG, through Guillot and Murvin, had been negotiating with Ms. Brenda Chung, President of United Academy, for United Academy's purchase of the Institute for the sum of $225,000. Chung had no knowledge of WKG's pre-existing agreement with Reynolds. Guillot contacted her on numerous occasions beginning in July or August, regarding United Academy's purchase of the Institute. Chung visited the school on several occasions during the time United Academy was negotiating with WKG. She even met David Reynolds. Guillot and Murvin told Chung to visit the school pretending that she was planning to enroll her nephew as a student. Guillot's given reason to Chung for the pretense was that he did not want school employees to know about business details. In September, 1989, WKG faxed Ms. Chung a copy of a proposed agreement to purchase, which she did not sign. She signed a letter of intent to purchase on October 3, 1989. Guillot subsequently offered to discount the purchase price to $205,000 in order to encourage Chung to proceed with the sale. *1026 The sale to Chung was completed on December 29, 1989.
After learning of United Academy's purchase of the Institute and the Institute's subsequent closure by the state, Reynolds' petition was amended and he sought return of the deposit and damages.
On day of trial, counsel for WKG who had been allowed to enroll at a late date was not present. Further he had not enrolled as counsel for Thibodeaux and Guillot. Their attorney, if any was so retained, was not present either. The trial judge refused to grant a continuance. He later dismissed WKG's claim against Reynolds. Trial proceeded on the reconventional demand. After trial on the merits, judgment was rendered in favor of Reynolds and against WKG and Guillot. Damages were awarded in the sum of $255,000 plus legal interest from date of judicial demand. Costs were assessed against WKG and Guillot.
From this judgment WKG and Guillot appealed. WKG was granted a suspensive appeal on December 13, 1991. WKG and Guillot subsequently applied for and were granted a devolutive appeal. The appeal of first appellant was dismissed for failure to timely file a brief. Briefs were filed on behalf of Guillot only.
Guillot alleges as error:
I. The decision of the District Court to find that a shareholder in a corporation is personally liable for the actions of the corporation was manifestly erroneous where no grounds were established at the trial for a piercing of the corporate veil and holding the shareholder personally liable.
II. The decision of the District Court to find that a party who first breaches a material clause of a contract has grounds to bring suit against the other party to the contract for the other party's alleged later breach of the contract was manifestly erroneous as a matter of law.
III. The decision of the lower court to find that when a party has means reasonably available to him to discover the details of contract which details may not have been made available to him and which may have affected his motivation for entering into the contract that party may then rescind the sale for failure of cause or failure of consent based on error is manifestly erroneous as a matter of law.
IV. The decision of the lower court to find that when a party to a contract to sell breaches a material clause of that contract, that party may then complain if the other party to the contract attempts to mitigate his losses in the contract by contracting to sell to someone else is manifestly erroneous as a matter of law.
V. The decisions of the lower court in not considering mitigating factors and factors which would have lessened the award of damages in the case, was manifestly erroneous where there was evidence introduced as to those mitigating factors.

PERSONAL LIABILITY OF GUILLOT
In the first assignment of error Guillot contends that the trial court erred in holding him personally liable for the acts of the corporation.
Generally, a shareholder is not personally liable for corporate acts except when the shareholder acting through the corporation commits fraud or misrepresentation on a third party; or where the shareholders, officers or directors disregard corporate formalities and treat the corporation as the alter ego of the shareholder or office. La.R.S. 12:93 and 95; McLean v. Smith, 593 So.2d 422 (La.App. 1st Cir. 1991).
The Supreme Court has also recognized an action against a shareholder or corporate officer for intentional and unjustified interference with contractual relations between the corporation and a third party. 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989). The elements of such a cause of action are:
(1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or *1027 causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burden-some; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
Id. at 234.
In oral reasons for judgment the trial court stated "I'm impressed with Ms. Chung's testimony about exactly what kind of boiler-room operation this was, you know, selling the same business twice."
Guillot was the majority shareholder and director and ran the corporation, calling "the majority of the shots." It was apparent from the testimony that Guillot had no intention of going through with the sale to Reynolds once he found that Ms. Chung, through her corporation, was willing to pay more than twice the price negotiated with Reynolds and he learned of this almost immediately after entering into the agreement with Reynolds. Guillot and Murvin were manufacturing reasons to postpone the sale, and to discourage and prevent the sale from occurring. Guillot made certain that Reynolds did not know that he, through WKG, was negotiating a sale to another party during the existence of the agreement between Reynolds and WKG.
The trial court obviously found that Guillot's actions were intentional; he had knowledge of the agreement; and his actions caused WKG to breach the agreement. Guillot had the burden of proving the justification of his actions upon which proof the actions would be privileged. The fiduciary duty of a corporate actor does not encompass the authority to act fraudulently or unethically. Such actions are beyond the scope of the privilege. Note, Piercing the Corporate Veil: Personal Liability of a Corporate Officer for Intentional Interference with Contract: 9 to 5 Fashions, Inc. v. Spurney, 51 La.L.Rev. 141 (1990). Although Guillot wanted WKG to breach the agreement with Reynolds in order to sell to Chung for a greater price, Guillot wanted WKG to keep and use Reynolds' $50,000 deposit, which it in fact had already spent. Additionally, Guillot through WKG also sought to obtain damages from Reynolds for Reynolds' alleged breach of contract, all the while having entered into a purchase agreement with Chung for the sale of the same property which was the subject of its agreement with Reynolds. The trial court was not manifestly erroneous in determining that Guillot's actions constituted intentional interference with a contract.

REYNOLDS' ALLEGED BREACH
In the second assignment of error Guillot contends that Reynolds was the first party to breach the agreement by refusing to pay the fees associated with obtaining the necessary approval for transfer from the regulatory agencies. Guillot claims Reynolds was obligated to pay these fees because such fees constitute expenses or incidental costs of sale which are chargeable to the buyer pursuant to La.C.C. Art. 1993. Guillot argues that pursuant to La. C.C. Art. 1994 because Reynolds first breached a material clause of the agreement, he may not put WKG and Guillot in default.
The purchase agreement provides in pertinent part:
1.
Seller shall create a Texas corporation, which shall be a wholly owned subsidiary of WKG-TV Video Electronic College, Inc. (College), to be known as DR Education Corporation, Inc., upon approval of the Secretary of State of the State of Texas, which shall have as its only asset the Institute, and its Equipment.
2.
Upon creation of the Texas corporation, Seller shall immediately transfer out of College the asset known as "Institute" into the Texas corporation.
3.
Buyer shall purchase the Texas corporation from College for an agreed price of ONE HUNDRED THOUSAND and NO/100 ($100,000.00) Dollars, of which sum Buyer has previously deposited with *1028 Seller the total amount of FIFTY THOUSAND AND NO/100 ($50,000.00) Dollars, receipt of which is hereby acknowledged, with the remaining balance of FIFTY THOUSAND AND NO/100 ($50,000.00) Dollars being due and payable on or before July 1, 1989, providing DR Education Corporation has been approved to act as a free standing school by Southern Association of Colleges and Schools and US Department of Education and Texas Guaranteed Student Loan Corp.[1]
Reynolds testified that a proprietary school must have agency approval of transfer in order for the school to be eligible for financial assistance, such as federal funding through the Guaranteed Student Loan Program and Pell Grants, and that 95 per cent of students in proprietary schools need financial assistance. Although a proprietary school can operate without agency approval it is very difficult, almost impossible, to do so without either substantial capital or a lender which would participate without such guarantees. Reynolds stated that if the Institute did not qualify for financial assistance he was not interested in purchasing the school. In the initial negotiations Guillot told Reynolds that for several months WKG had been working towards obtaining the requisite approval and qualifications to have the Institute accredited as a free standing campus. The SACS approval of Institute as a free standing school was received on July 4 but WKG never completed and forwarded the applications allegedly because of the dispute over the application fees.
Reynolds did not breach the agreement in this regard or in any other. The sale was contingent on the transfer of Institute to DR and the obtaining of agency approval. Clearly the obligation of transferring Institute to DR and obtaining agency approval were those of WKG. So were the costs associated with doing so.
La.C.C. Art. 2466 is not applicable to this case because these fees are not costs and expenses incidental to the sale. They are inherent in obtaining the requisite approval upon which the sale is contingent.
This assignment is without merit.

ASSIGNMENTS 3 AND 4
In the third assignment of error Guillot contends that Reynolds should not be allowed to rescind the contract for "details which may not have been revealed to him" when Reynolds was subsequently able to discover the "details."
This assignment of error has no merit because Reynolds is not attempting to rescind the contract. The contract was breached by Guillot's failure to perform even the most basic contractual obligations; the Institute was sold to another party and was subsequently closed by the State of Texas.
In the fourth assignment of error Guillot contends that since Reynolds breached the purchase agreement he may not now complain of WKG's attempt to mitigate damages by selling the Institute to a third party. We have already determined Reynolds was not in breach of the contract. He stood ready and waiting to perform. This assignment is without merit. Accordingly the judgment of the trial court is affirmed. Costs of this appeal are assessed against Guillot.
AFFIRMED.
NOTES
[1] The Texas Guaranteed Student Loan Corporation was handwritten into the contract and initialed "WKG" and "DGR".